UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ERIC WESTMAN,

        Petitioner,

v.

JOSEPH LEHMAN, et. al.,

        Respondents.

CASE NO. C04-2177-TSZ

REPORT AND RECOMMENDATION

## I. INTRODUCTION AND SUMMARY OF CONCLUSION

Petitioner, Eric Westman, is proceeding *pro se* in this 28 U.S.C. § 2254 habeas corpus challenge to his judgment and sentence. He brings a due process challenge alleging: 1) conviction based on insufficient evidence, 2) denial of his right to present a full defense, and 3) conviction based on an erroneous jury instruction. After careful consideration of the record, including petitioner's motion for summary judgment and the submission of the parties, the undersigned concludes that no evidentiary hearing[1] is required and that the Petition should be denied.

---

[1] In his reply, petitioner's arguments regarding an evidentiary hearing focuses on having been deprived of his right to an evidentiary hearing at the state court level, not that he is entitled to an evidentiary hearing on his habeas petition. Thus, discussion of this issue is unwarranted.

REPORT AND RECOMMENDATION - 1

## II. **FACTUAL BACKGROUND**

The Washington Court of Appeals summarized the facts surrounding petitioner's conviction as follows:

> Tina McPherson and Eric Westman had a four-year romantic relationship that McPherson broke off in mid-December 1997. McPherson then pursued a relationship with the victim, David Stone.
>
> Westman and McPherson continued working together after their relationship ended. According to some of the couple's co-workers, after the break-up Westman became reclusive and "gloomy," and he constantly watched McPherson. McPherson's pager records reveal that Westman paged her an average of 13 times a day after the break-up. He had paged her less than once a day in the months before the break-up.
>
> Westman told co-workers he still loved McPherson and described Stone as a "low life scumbag." He repeatedly told McPherson that he "hated" Stone. On January 10, 1998, Westman told a friend that he felt very hurt by the break-up with McPherson and was afraid of what he might do to Stone.
>
> Three days after the couple broke up, Westman left a message on Stone's answering machine stating, "I'm going to fuck you up." On another occasion, Westman told McPherson over the telephone, "if you hang up, I'm gonna fuck him up."
>
> McPherson told Westman his behavior frightened her and she feared he might try to kill her or Stone. Westman responded, "I'm not responsible for what I do." On another occasion, Westman remarked to a mutual friend that McPherson and Stone would "pay" for their relationship.
>
> Westman told McPherson that he knew where Stone lived. On January 20, 1998, McPherson saw Westman parked near Stone's apartment building.
>
> On the evening of the murder, Friday, January 23, 1998, McPherson spoke with Stone on the telephone from approximately 6:10 to 6:30 p.m. She called him back at 7:30, but there was no answer.
>
> McPherson arrived at Stone's apartment at approximately 8:00 p.m. She found him dead on the floor. Westman had been shot in the chest and the back of the head. The apartment showed no signs of forced entry or struggle. McPherson told police that she believed her former boyfriend, Eric Westman, might be responsible.
>
> After the murder, police found a note near the telephone in Stone's apartment. The note read:

REPORT AND RECOMMENDATION - 2

AS A FRIEND TO BOTH PARTIES THAT WERE IN THE RELATIONSHIP I KNOW THAT YOU PLAYED A PART IN SPLITTING IT APART. I KNOW THAT YOU NEED TO WATCH OUT FOR HIM. HE COULD HURT YOU OR WORSE. THEY BOTH HAVE BEEN CHANGED BY THIS AND I'M NOT SURE IF IT IS GOOD. YOU SHOULD THINK ABOUT WHAT YOU HAVE DONE AND WHAT COULD HAPPEN AND DECIDE WHAT IT IS WORTH. AND IF SHE IS WORTH ALL THIS. ALL I AM WORRIED ABOUT IS THAT SOMETHING MAY HAPPEN. DON'T PUSH HIM OR GET HIM ANY ANGRIER AT YOU. BE CAREFUL. A CONCERNED FRIEND OF THOSE TWO.

Forensic examination of the note revealed that it had been typed on a typewriter at the Marine Reserve Center in the work space where Westman worked as a reservist.

Stone was killed with a .38 caliber gun. Several days before the murder, Westman borrowed a .38 caliber revolver from his brother Dennis Betland. The gun was never returned and never recovered. A ballistics expert determined that the bullets recovered from the victim's body were shot from the same revolver that Westman had borrowed from Betland. The expert reached this conclusion by comparing the bullets from the victim's body with bullets that Betland had previously fired from the revolver at a friend's property. On the night of the murder, Eric Westman's other brother David was seen in a tavern carrying a gun similar to the one that Eric had borrowed from Betland.

In his statement to police, Westman claimed that he left work at 4:30 p.m. on the day of the murder and drove to downtown Auburn to look for his brother David. He found David in a bar within half an hour. Eric proceeded to a Wells Fargo Bank to withdraw money, and then to Safeway to buy food. About 15 minutes later, he returned to the bar where he had earlier found David. According to Eric, he left the bar sometime between 6:15 and 6:30 p.m. and returned to his house in Enumclaw at around 7:00 p.m. He did laundry at home, took his son to a friend's house in Ravensdale, and returned home a little after 8:00 to watch a movie.

Receipts produced at trial reflected that Westman withdrew money from the Auburn branch of Wells Fargo Bank at 5:18 p.m. and bought food from Safeway at 5:28 p.m. The Safeway and Wells Fargo Bank are located five minutes from the victim's apartment complex. Westman's son paged him from their house five times between 6:24 p.m. and 6:48 p.m. Westman finally answered his son's pages at 7:01 p.m., from a pay phone at a store 10 minutes from the victim's apartment. According to his son, Westman arrived home at around 7:20 p.m. In sum, there was no evidence presented to corroborate Westman's account of his whereabouts between 5:28 p.m. and 7:01 p.m.

One of Stone's neighbors saw a blue Mustang that she later

REPORT AND RECOMMENDATION - 3

identified as Eric Westman's, in the parking lot of the victim's apartment complex at approximately 5:00 p.m. Two white men were in the car. The neighbor could not identify the men.

The medical examiner determined that the victim had marijuana and cocaine in his urine at the time of death. The doctor testified that because the drugs were in Stone's urine but not his blood, Stone had probably taken the substances "at some previous time."

Westman was arrested on the morning after the murder. He waived his Miranda rights and spoke to Detectives Robert Jones and Steve Stocker directly following his arrest. Westman did not request an attorney and agreed to answer the detectives' questions. Detective Jones admitted using several "ruses" in an attempt to elicit a confession during the interview.

That afternoon, Westman asked a jail guard if he could call an attorney. Westman was given a phone book and allowed to place a call to an attorney. He did not reach the attorney and left a message. The detectives investigating the murder were not told of Westman's attempt to contact an attorney.

Later that day, Westman was contacted by Detective James Kovac and agreed to participate in a polygraph examination. Westman was again advised of his rights and waived them. That evening, Detective Kovac contacted Westman to obtain a written statement. Westman was again advised of his rights and waived them. At no point during this period did Westman request an attorney or mention to Kovac his previous attempt to contact an attorney.

The next morning, Detective Andrew Gould interviewed Westman. While the interview was in progress, Sergeant Robert Crouch spoke to Westman's mother. She informed the sergeant that Westman had asked for an attorney. Sergeant Crouch immediately relayed this information to Detective Gould. Detective Gould attempted to terminate the interview, but Westman told Gould that he wished to continue. Westman signed a waiver stating, "I have asked for an attorney but will talk to Detective Gould without an attorney present."

That evening, Westman asked to speak to Detective Gould again. He signed another waiver stating, "I, Eric Westman, am fully aware of my rights and have previously requested an attorney. However, I specifically requested Detective Gould to speak to me and summoned him." Westman spoke to an attorney later that evening. In his interviews with police, Westman consistently denied responsibility for the shooting.

A CrR 3.5 hearing was held to determine the admissibility of Westman's statements to police. The court concluded that Westman had made a knowing, voluntary and intelligent waiver of his rights, and that all of his statements to police were admissible. At trial, the State

REPORT AND RECOMMENDATION - 4

> presented only those statements that Westman had made to Detectives Jones and Stocker directly following his arrest and his written statement to Detective Kovac.
>
> Westman proffered evidence regarding Stone's involvement with drugs. He proffered the evidence to prove that someone else might have had a motive to kill Stone and to help explain the circumstances surrounding Stone's death. The court admitted evidence regarding the presence of drugs in Stone's system at the time of death, but otherwise excluded references to Stone's involvement with drugs.
>
> A jury found Westman guilty of first degree murder while armed with a handgun. The court sentenced him to 300 months confinement. . . .

Dkt. #10 (Exhibits 1-21), Ex. 2, pp. 2-7.

## III.  PROCEDURAL HISTORY

On July 31, 1998, petitioner was convicted of first degree murder and was sentenced to 300 months in jail.  Ex. 1.  Petitioner appealed to the Washington Court of Appeals, which affirmed the conviction on March 6, 2000.  Ex. 2; Ex. 3.  The Washington Supreme Court denied review on September 6, 2000.  Ex. 7.  The Washington Court of Appeals issued its mandate on September 26, 2000.  Ex. 9.

Subsequent to petitioner's conviction and exhaustion of the state appeals process, the Washington Supreme Court held that the jury instruction that defined accomplice liability in Washington state was erroneous.[2]  On September 6, 2001, petitioner filed a personal restraint petition ("PRP") in the Washington Court of Appeals challenging his conviction based on the erroneous accomplice liability instruction.  Ex. 10.  The Washington Court of Appeals dismissed his petition.  Ex. 16.  Petitioner sought review by the Washington Supreme Court.  Ex. 17.  On July 27, 2004, the Commissioner of the

---

[2] The Washington Supreme Court found the jury instruction that defined accomplice liability erroneous because it allowed accomplice liability to attach if the defendant knew that he is aiding in the commission of "a crime," meaning any crime, as opposed to the statutory requirement of "the crime," meaning the crime with which the defendant is charged.  *See State v. Cronin*, 142 Wn.2d 568, 14 P.3d 752, 758 (2000); *State v. Roberts*, 142 Wn.2d 471, 14 P.3d 713, 736 (2000).

REPORT AND RECOMMENDATION - 5

Washington Supreme Court denied review. Ex. 18. Petitioner's motion to modify the Commissioner's ruling was denied by the Washington Supreme Court on October 5, 2004. Ex. 19; Ex. 20. The Washington Court of Appeals issued its mandate on November 4, 2004. Ex. 21.

## IV. **GROUNDS FOR RELIEF**

Petitioner presents this Court with the following six grounds for habeas relief:

> 1. Is a conviction for first degree premeditated murder constitutionally firm when it is not based on sufficient evidence of guilt beyond a reasonable doubt?
>
> 2. Is a conviction for first degree premeditated murder constitutionally firm when a criminal defendant is prevented from presenting a defense?
>
> 3. Is a conviction for first degree premeditated murder constitutionally firm when the state employs a jury instruction which misstates the law in such a way as to relieve the state of proving all essential elements of the crime beyond a reasonable doubt?
>
> 4. Is a conviction for first degree premeditated murder constitutionally firm when a jury instruction essentially directs a jury verdict?
>
> 5. Is a jury instruction which directs a verdict a structural error not subject to harmless error analysis?
>
> 6. Is a jury instruction harmless when it relieves the state of its burden of proof?

Dkt. #1, Petition, p. 10.

## V. **STANDARD OF REVIEW**

Generally, state court judgments carry a presumption of finality and legality. *McKenzie v. McCormick*, 27 F.3d 1415, 1418 (9th Cir. 1994), *cert. denied*, 513 U.S. 1118 (1995). Habeas relief does not lie for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). The petitioner must prove the custody violates the Constitution, laws, or treaties of the United States. *Id.* at 68. However, a constitutional error at trial

REPORT AND RECOMMENDATION - 6

will not warrant habeas relief unless the violation in question "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-39 (1993); *Kotteakos v. United States*, 328 U.S. 750, 764 (1946).

Germane also, the Antiterrorism and Effective Death Penalty Act ("AEDPA") imposes a "highly deferential standard for evaluating state court rulings." *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003) (*quoting Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). The AEDPA prohibits relief on any claim adjudicated in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The state court decision may be contrary to federal law if 1) the court "applies a rule that contradicts the governing law set forth" by the Supreme Court or 2) if the court arrives at a different result in a case that is "materially indistinguishable from a [Supreme Court] decision." *Luna v. Cambra*, 306 F.3d 954, 960, *as amended* 311 F.3d 928 (9th Cir 2002); *see also Williams v. Taylor*, 529 U.S. 362, 405 (2000). To meet the second standard, "the state court's decision must be substantially different from the relevant precedent of this Court." *Williams*, 529 U.S. at 405.

A state court decision involves an unreasonable application of clearly established federal law if a state court decision correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case. *Williams*, 529 U.S. at 407-08. In making the 'unreasonable application' inquiry, it is insufficient that the relevant state-court decision was applied erroneously. *Id.* at 411. The federal court must determine whether the state court's application was objectively reasonable. *Id.* at 409.

REPORT AND RECOMMENDATION - 7

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence present in state-court proceedings, § 2254(d)(2)." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## VII. DISCUSSION

Petitioner argues with respect to all his claims that the state court decision was: 1) "contrary to" and 2) an "unreasonable application" of clearly established federal law. Petitioner's "contrary to" argument is without merit. Petitioner has not cited to any federal case law that contradicts the state court analysis.[3] While petitioner cites to many United States Supreme Court cases that purportedly reach a result different from the one reached by the state court in this case, an examination of the cases reveals that the facts are not analogous here[4]

Additionally, in his reply to the government's brief, petitioner argues that the state

---

[3] Petitioner repeatedly argues that with respect to his first and second claims, the Washington Court of Appeals failed to expressly cite to United States Supreme Court cases that identify the applicable legal standards. However, the Supreme Court has clarified that the habeas statute "does not even require awareness of [Supreme Court] cases;" a state court decision is not "contrary to" Supreme Court precedent if it the court's reasoning and result are not contrary to Supreme Court precedent. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). Accordingly, the state court's failure to cite to a specific case does not alone render its decision "contrary to" the United States Supreme Court precedent.

[4] Regarding his sufficiency of evidence claim, petitioner argues that the state court decision is contrary to *Jackson v. Virginia*, 433 U.S. 307 (1979). Dkt. #1, Petition, p. 54. Regarding denial of his right to present a full defense claim, petitioner argues that the state court decision is contrary to *Crane v. Kentucky*, 476 U.S. 683 (1986); *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987); *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Washington v. Texas*, 388 U.S. 14 (1967). *Id.* at 55. Regarding his erroneous jury instruction claim petitioner argues that the state court decision is contrary to *Brecht*, 507 U.S. 619; *Sullivan v. Lousiana*, 508 U.S. 275, 282 (1993); *Sandstrom v. Montana*, 442 U.S. 510; *Cage v. Louisiana*, 498 U.S. 39 (1990); *Cabana v. Bullock*, 474 U.S. 376 (1986); *Carella v. California*, 491 U.S. 263 (1989); *Boyde v. California*, 494 U.S. 370 (1990); *Kotteakos*, 328 U.S. 750; and *Martinez v. Garcia*, 371 F.3d 600 (2000). *Id.*

REPORT AND RECOMMENDATION - 8

court factual findings regarding all his claims are not entitled to a presumption of correctness because "(1) the state court findings are not fairly supported by the record," and "(2) the state court's resolution of the claim was based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings."[5] Dkt. #13, Petitioner's Reply, p. 7. In light of the discussion below, petitioner has failed to provide clear and convincing reasons to rebut the presumption of correctness that must be accorded to the findings of fact underlying his conviction. See 28 U.S.C. § 2254(e)(1).

### A.   **Sufficiency of Evidence**

Petitioner contends that the evidence presented at his trial was insufficient to conclude that he was guilty of premeditated first degree murder, thus making the state court decision an unreasonable application of a clearly established federal law.

In reviewing a sufficiency of evidence claim, the due process clause requires a determination of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Court owes great deference to the trier of fact. *E.g.*, *Wright v. West*, 505 U.S. 277, 296 (1992).

### 1.   **Premeditation element**

Petitioner argues that there was insufficient evidence of premeditation because, under Washington state law, evidence that a defendant had expressed anger, hate, and disgust toward the victim was insufficient premeditation to support a conviction. *RCW* 9A.32.020(1). A finding of premeditation is a finding of fact that is entitled to a presumption of correctness unless rebutted by petitioner by clear and convincing

---

[5] Petitioner cites extensively to case law from the 9th Circuit and other circuits, but fails to make any argument as to how these cases support his claim. All the cases cited held either that the presumption of correctness was rebutted by clear and convincing evidence or that the state court failed to find the relevant facts. None of the cases cited are factually analogous to the present case.

REPORT AND RECOMMENDATION - 9

1  evidence. *See* 28 U.S.C. § 2254(e)(1). In light of the record, petitioner's arguments fail
2  to rebut the presumption of correctness. Taken together, petitioner's statements that he
3  would not be responsible for what he might do to the victim, his threats to the victim over
4  the phone and by an anonymous note, his lurking around the victim's apartment a few
5  days before the murder and on the day of the murder, and his borrowing of the murder
6  weapon three days before the murder support the finding of premeditation.

7      Accordingly, there was sufficient evidence to justify the state court's finding of
8  premeditation.

        **2.    Identity Evidence**

10      Petitioner also argues that there was insufficient evidence for a rational trier of fact
11  to find him guilty of having personally committed the murder. First, petitioner argues
12  that because the time of death was probably after 7:00 p.m. and his alibi was corroborated
13  starting at 7:20 p.m., Dkt. #16 (Exhibits 22-40), Ex. 39, pp. 19-20, 23, 40-1, it was
14  unlikely that he killed the victim. In support of his argument, petitioner notes that the
15  state's expert initially estimated that the victim died at 9:00 p.m., but later testified that
16  the victim died at 7:00 p.m. or later. Ex. 35 at 22. Petitioner urges insufficiency based
17  upon the investigating officers' determination that the gun fire would have sounded like
18  moving furniture if heard from a neighboring apartment, Ex. 37 at 211-212, and the
19  victims's next door neighbor's testimony that he heard what sounded like furniture
20  moving in the victim's apartment at around 7:40 p.m.-7:50 p.m., Ex. 38 at 95.
21  Consequently, petitioner's alibi proves that he could not have committed this murder.

22      Second, petitioner argues that there was a lack of physical evidence connecting
23  him to the crime scene: there were no fingerprints found at the scene (Ex. 36 at 82-100),
24  his clothes and car had no blood on them (*Id.* at 48-9, 55-6), and his hands had no
25  gunshot residue (*Id.* at 118). Furthermore, petitioner argues that were no signs of forced
26  entry into the victim's apartment and it was unlikely that the victim would have willfully

REPORT AND RECOMMENDATION - 10

opened the door to petitioner given his recent threats.  Ex. 32 at 95, 115.

Third, petitioner argues that he was not seen in the apartment complex at the time of the murder.  Petitioner notes that the only evidence of his presence in the apartment complex was witness testimony indicating that a Mustang, which was later identified as his vehicle, was next to the victim's apartment an hour before the victim was last known to be alive.  Ex. 36 at 36-67.  Petitioner argues that 1) the identification by the eyewitness was suspect, given her inaccurate description of the car and because of her inability to identify the men in the car (Ex. 34 at.35; Ex. 36 at 72-75, 77; Ex. 37 at 74); and 2) the alleged sighting was not close to the time of the murder but at least an hour before to the murder (Ex. 36 at 36-67).

Even with the alleged weaknesses in the state's case, a rational juror could find competent circumstantial evidence of petitioner's guilt and could find petitioner's alibi evidence unpersuasive.  The expert who testified as to the time of death stated he could not rule out the time period between 6:30 p.m. and 7:00 p.m. as the time of death.  Ex. 35 at 23.  Moreover, petitioner cannot corroborate his whereabouts between 5:28 p.m. and 7:01 p.m., and he did not answer his son's repeated pages between 6:24 p.m. and 7:01 p.m.  Ex. 2 at 8-10.  While the gun petitioner borrowed from his brother, Dennis Betland, was never recovered, a ballistics expert determined that the bullets recovered from the victim's body were shot from the same revolver that petitioner had borrowed.[6]  *Id.*  Also, while no blood was found on petitioner's clothing, an expert testified that the shooter does not always get blood on himself.  Ex. 36 at 50-51.  In fact, this expert testified that in a murder such as this one, it is rare to find blood.  Ex. 34 at 130.  With respect to the allegedly suspect identification by the victim's neighbor, even though she gave an

---

[6] The expert reached this conclusion by comparing the bullets from the victim's body with bullets that Betland had previously fired from the revolver at a friend's property.  Ex. 34 at.10-14; Ex. 37 at 97-112.

REPORT AND RECOMMENDATION - 11

inaccurate description of the Mustang, she positively identified the same car in a picture. Ex. 36 at 72-75, 77.

Accordingly, there was sufficient evidence for a rational juror to conclude that petitioner's alibi was not sufficient and that the state's evidence demonstrated proof beyond a reasonable doubt.

### 3. Accomplice Liability

Petitioner makes two arguments: 1) the state did not produce sufficient evidence of guilt based on a theory of accomplice liability, and 2) it was only due to the erroneous jury instruction on accomplice liability that petitioner was convicted (discussed in section "C" below). In support of his first argument, petitioner disputes evidence that his brother was at or near the crime scene on the day or time of the murder. He argues there was no evidence that his brother was the shooter, nor evidence of any discussion between petitioner and his brother regarding harming the victim. Petitioner argues that the weapon seen in his brother's possession the day of the murder was never recovered and that ballistics testing did not connect it to the murder weapon. Ex. 36 at 152-154. Furthermore, petitioner disputes that the weapon seen in the brother's possession matched the description of the gun petitioner had borrowed from his other brother. Ex. 34 at 11, 15-16; Ex. 36 at 144, 147. Finally, petitioner argues that his brother arrived at the tavern at 7:15 p.m. on the day of the murder and it was unlikely that the victim was dead at that time.

The court is not persuaded by these arguments in as much as there was sufficient evidence for a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt based on a theory of accomplice liability. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). While the witness could not identify petitioner or his brother, she described the vehicle's driver as having a beard, which fit the description of petitioner's brother. Ex. 36, pp. 63-67, 72-75. This same person was seen in the company of another

REPORT AND RECOMMENDATION - 12

person in a car identified as petitioner's vehicle.  *Id.*  Moreover, petitioner's brother was later seen with a gun in a tavern located less than five minutes away from the victim's dwelling.  *Id.*, pp. 133-155.  Finally, the record reveals that there was a high degree of similarity between the gun borrowed by petitioner, which was positively identified by ballistics testing as the murder weapon, and the gun in the brother's possession.  *Id.*, pp. 144-147.

### B.     Right to Present a Complete Defense

Petitioner claims he was deprived of his Sixth and Fourteenth Amendment due process right to present all evidence relevant to establish a defense.  He argues that the trial erred in excluding evidence regarding the victim's involvement in using and dealing drugs.  Petitioner argues that the evidence was relevant to counter the state's assertion that only the petitioner had a motive to kill Stone.  Moreover, he argues that this evidence raises reasonable doubt by showing that the victims's murder may have occurred because of his involvement in the dangerous world of illegal drug dealing.[7]

The Sixth Amendment requires that "criminal defendants have . . . the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  This right is a fundamental element of due process of law.  *Washington v. Texas*, 398 U.S. 14, 19 (1967).  However, a defendant's right to present a defense is far from absolute.  *Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996).  Evidence is admissible only if it is relevant.  ER 402.  Even where the evidence is relevant, trial judges retain wide latitude to impose reasonable limits on the presentation of evidence and to exclude evidence.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also Egelhoff*, 518

---

[7] In support of this argument petitioner cites to *United States v. Holland* where the D.C. Circuit court noted that crimes of violence are likely to occur in the "dangerous criminal milleu" that accompanies drugs.  *United States v. Holland*, 810 F.2d 1215, 1219 (D.C. Cir), *cert. denied*, 481 U.S. 1057 (1987).

REPORT AND RECOMMENDATION - 13

U.S. at 42-43. Thus, for a petitioner to be granted habeas relief, "[t]he state court's decision to exclude certain evidence must be so prejudicial as to jeopardize the defendant's due process rights." *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990), *cert. denied*, 498 U.S. 1091 (1991).

In this case, petitioner sought to introduce at his trial evidence regarding the victim's connections to the dangerous world of drug dealing including: 1) an autopsy showing track marks on Stone's arms; 2) a message left by Tina McPherson on Stone's answering machine asking whether she could "spend money" for him that night; 3) the testimony of Tina McPherson's husband that she was a heavy drug user; and 4) evidence of a letter that Tina McPherson sent to her husband after the murder stating her belief that her husband would be happy about Stone's death. Dkt. #1, Petition, p. 27-28.

The Washington Court of Appeals correctly concluded that the proffered evidence was not relevant. Ex. 2 at 10-13. The Court of Appeals noted that the proffered evidence was highly speculative to the extent that it was aimed at establishing that the victim was a drug dealer. *Id.* Because this evidence did not prove or make it likely that the victim was a drug dealer, it was not probative. Additionally, this evidence was cumulative of the victim's drug usage, a fact already established by the admission of evidence regarding the presence of cocaine and marijuana in the victim's urine. Ex. 2 at 10-13. Given the marginal relevance of the proffered evidence, balanced against the "substantial state interest . . . in excluding unreliable or prejudicial evidence," *Tinsley*, 895 F.2d at 531, it is clear that the exclusion of the evidence is not an error of constitutional proportion.

Assuming, *arguendo*, that this evidence proved that the victim was a drug dealer and was exposed to the dangers of the criminal world, its exclusion was harmless. The introduction of such evidence would not have disproved that petitioner possessed the means, intent, or motive to murder the victim. In light of the circumstantial evidence linking petitioner to the murder, especially the forensic tests that tied the weapon he

REPORT AND RECOMMENDATION - 14

borrowed from his brother with the murder, the exclusion of such drug involvement evidence did not result in "actual prejudice," nor can its absence be said to have "had a substantial and injurious effect in determining the jury's verdict." *See Brecht*, 507 U.S. at 637.

Accordingly, petitioner's claim that the state court's exclusion of this evidence denied his right to present a defense lacks merit.

**C.    Erroneous Accomplice Liability Instruction**

Petitioner argues he was convicted based on the erroneous accomplice liability instruction and that the state appellate court applied the federal law unreasonably when it found the error to be harmless.

A claim that a jury instruction is incorrect under state law in not a basis for habeas corpus relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Gilmore v. Taylor*, 508 U.S. 333, 341-42 (1993). The petitioner must prove that the erroneous jury instruction violated some right guaranteed defendant by the Fourteenth Amendment. *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). "[R]eview is limited to whether an allegedly defective jury instruction 'so infected the entire trial that the resulting conviction violates due process.'" *Carringer v. Lewis*, 971 F.2d 329, 334 (9th Cir. 1992), *cert. denied*, 507 U.S. 992 (1992) (*quoting Cupp*, 414 U.S. at 147).

Even where there is a constitutional error, it will not warrant habeas relief unless the violation in question "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637-38. For example, the United States Supreme Court has held that a jury instruction that omits an element of an offense is subject to the harmless error analysis. *Neder v. U.S.*, 527 U.S. 1, 10-13 (1999). Habeas relief must be granted only where the state court judgment leaves the court with "grave doubt as to the harmlessness of the error." *California v. Roy*, 519 U.S. 2, 5 (1996).

Here, both the Washington Court of Appeals and the Commissioner of the

REPORT AND RECOMMENDATION - 15

Washington Supreme Court concluded that the instruction in petitioner's case was the same erroneous instruction employed by the state in *Cronin* and *Roberts*. However, both courts held that petitioner's substantial rights had not been affected because 1) only murder had been charged and 2) the prosecution had only discussed the charge of murder in making its closing arguments and not other crimes. Ex. 3 at 7.

In denying petitioner's PRP on this issue, the Washington Supreme Court stated:

> Since this is a personal restraint petition, Mr. Westman bears the burden of demonstrating that the instructional error had a substantial and injurious effect on the verdict, raising a grave doubt as to the harmlessness of the error. In re Smith, 117 Wn. App. 846, 859-60, 73 P.3d 386 (2003).
>
> Mr. Westman makes no showing. As the Court of Appeals explained in detail, the evidence strongly indicated that Mr. Westman was the principal in the murder, and to the extent there was evidence that he was an accomplice, it pointed solely to Mr. Westman's solicitation of murder. Mr. Westman urges that the jury might have found he solicited only an assault on the harassment of the victim, but he cites no evidence that would have reasonably supported such a finding. Moreover, the State argued the case solely in terms of murder; the prosecuting attorney never suggested to the jury that Mr. Westman could be found guilty of murder based only on his knowing participation in some other crime. In short, Mr. Westman does not demonstrate that the instructional error had a substantial and injurious effect on the verdict.

Dkt. #10, Exhibit 18, pp. 1-2

**1.     Erroneous Instruction Was Not a Structural Error**

Petitioner first claims that the erroneous jury instruction was a "structural error," which under *Arizona v. Fulminante*, 499 U.S. 279 (1991), defies the application of harmless error review. *See Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993). Petitioner argues that the erroneous jury instruction acted as a directed verdict.

There is "a limited class of fundamental constitutional errors that 'defy analysis by "harmless error standards."'" *Neder v. U.S.*, 527 U.S. 1, 7 (1999) (quoting *Arizona v.*

REPORT AND RECOMMENDATION - 16

*Fulminante*, 499 U.S. at 309).[8] In *United States v. Montalvo*, the Ninth Circuit surveyed the United States Supreme Court Cases characterizing errors as structural and noted that "the list of structural defect is short and limited." *United States v. Montalvo*, 331 F.3d 1052, 1056-57 (9th Cir. 2003). The types of errors identified by the United States Supreme Court as structural errors include: 1) total deprivation of the right to counsel at trial, *see Gideon v. Winwright*, 372 U.S. 335 (1963); (2) biased judge, *see Tumey v. Ohio*, 273 U.S. 510 (1927); (3) unlawful exclusion of members of the defendant's race from a grand jury, *see Vasquez v. Hillery*, 474 U.S. 254 (1986); (4) right to self representation at trial, *see McKaskle v. Wiggins*, 465 U.S. 168 (1984); (5) right to a public trial, *see Waller v. Georgia*, 467 U.S. 39 (1984); and (6) constitutionally deficient reasonable doubt instruction, *see Sullivan v. Lousiana*, 508 U.S. 275 (1993).

Petitioner's claim of error does not rise to the level of structural defects identified by the Supreme Court and cannot be deemed to "necessarily render a trial fundamentally unfair." Accordingly, petitioner's argument fails.

### 2. Erroneous Jury Instruction Was a Harmless Error

Petitioner also contends that even if the claimed error is subject to the harmless error standard, this error was not harmless because this instruction relieved the state of its burden to prove all essential elements of the crime beyond a reasonable, thus denying petitioner his due process rights. Petitioner argues that the erroneous instruction may have allowed the jury to convict him even if they did not believe he intended or was involved in the victims's death. Recognizing that the jury did not necessarily convict him based on a theory of accomplice liability, petitioner cites to *Martinez v. Garcia,* 371 F.3d 600, 603-04 (4th Cir. 2004)*,* where the court held that in cases submitted to the jury on

---

[8] "Errors of this type are so intrinsically harmful as to require automatic reversal (*i.e.*, 'affect substantial rights") without regard to their effect on outcome. *Neder*, 527 U.S. at 7. These structural errors "infect the entire trial process," *Brecht*, 507 U.S. at 630, and "necessarily render a trial fundamentally unfair," *Rose v. Clark*, 478 U.S. 570, 577 (1986).

alternative theories, in some instances, the unconstitutionality of any of the theories requires that the conviction be set aside.

We agree with petitioner that a jury instruction violates federal due process when it could potentially allow a jury to convict a defendant without proof of guilt beyond a reasonable doubt of the crime with which he is charged.  However, an examination of the record supports the state court of appeal's conclusion of harmless error.  Murder in the first degree was the only crime with which petitioner was charged and the only crime presented to the jury.  Ex. 40 at 11-12, 18.  It may be true that in presenting evidence of petitioner's behavior leading up to the crime, the prosecution brought to the jury's attention evidence of petitioner's harassment of Stone and the "stalking" of McPherson.  Ex. 34 at 77, 183-84; Ex. 35 at 67, 74-75, 86-89, 194-213.  However, the record shows that the prosecutor never used the erroneous portion of the instruction in closing argument to encourage conviction based on uncharged crimes.  While it is true that during his closing argument the prosecutor discussed petitioner's harassment of McPherson and Stone prior to the murder, Ex. 40 at 16-17, this discussion was aimed at proving that there "is overwhelming evidence of premeditated intent in this case," *Id.*, p. 31.

In presenting the alternative theory of guilt based on accomplice liability, the prosecution discussed only the crime of murder.  When explaining the accomplice liability jury instruction, the prosecutor stated "[t]he law of accomplice liability is such that when you mastermind something, when you plan something, if your hands touch that crime in any respect whatsoever, they're just as bloody, they're just as dirty as your partner," thus making clear that liability as accomplice attached only by participating in the specific crime with which the defendant was charged.  *Id.*, p. 36.  Therefore, contrary to petitioner's assertion, the jury was not misled into thinking a conviction could based on participation in a crime other than murder.

Accordingly, the erroneous instruction was harmless beyond a reasonable doubt

REPORT AND RECOMMENDATION - 18

1  and, therefore, not an unreasonable application of clearly established federal law.

## VIII.  CONCLUSION

For the reasons stated above, I recommend that the petitioner's federal habeas petition be DENIED and that this action be dismissed with prejudice.  Based on this conclusion, petitioner's motion for summary judgment should be STRICKEN as moot.  A proposed order accompanies this Report and Recommendation.

DATED this 17th day of June, 2005.

MONICA J. BENTON
United States Magistrate Judge

REPORT AND RECOMMENDATION - 19